# Illinois Official Reports

## Appellate Court

*Certain Underwriters at Lloyd's, London v. Abbott Laboratories*,
2014 IL App (1st) 132020

| | |
|---|---|
| Appellate Court Caption | CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, Subscribing to Policy Number 548/NS3003500; CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, Subscribing to Policy Number 548/NS3003700; UNDERWRITERS AT LLOYD'S, LONDON, Subscribing to Policy Number 769/009020; and UNDERWRITERS AT LLOYD'S, LONDON, Subscribing to Certificate Number MPT-00144300; Plaintiffs and Counterdefendants-Appellants and Cross-Appellees, v. ABBOTT LABORATORIES, Defendant and Counterplaintiff-Appellee and Cross-Appellant. |
| District & No. | First District, First Division<br>Docket Nos. 1-13-2020, 1-13-2035 cons. |
| Filed | July 28, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from a dispute over the insurance coverage for the losses suffered by defendant pharmaceutical company as a result of a recall of a drug it manufactured, the trial court's finding rejecting plaintiff insurers' claim that coverage had been rescinded and the finding that plaintiffs' ratified coverage and waived rescission were upheld; furthermore, the appellate court affirmed the trial court's denial of plaintiffs motion to compel production of certain privileged documents, the rejection of defendant's counterclaims for vexatious delay and prejudgment interest, and the date set from which the award of postjudgment interest to defendant would accrue. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 03-CH-9307; the Hon. Richard J. Billik, Jr., and the Hon. Thomas R. Mulroy, Judges, presiding. |

| | |
|---|---|
| Judgment | Affirmed. |
| Counsel on Appeal | Forde Law Offices LLP (Kevin M. Forde and Joanne R. Driscoll, of counsel), Shefsky & Froelich Ltd. (J. Timothy Eaton and Jonathan Amarilio, of counsel), and Richard J. Prendergast, Ltd. (Richard J. Prendergast, of counsel), all of Chicago, for appellants. |
| | Tabet DiVito & Rothstein LLC (Gino L. DiVito and John M. Fitzgerald, of counsel) and Winston & Strawn LLP (Lawrence R. Desideri, Stephen V. D'Amore, Neil M. Murphy, and Matthew R. Carter, of counsel), both of Chicago, for appellee. |
| Panel | JUSTICE DELORT delivered the judgment of the court, with opinion. Presiding Justice Connors and Justice Hoffman concurred in the judgment and opinion. |

**OPINION**

¶ 1      This case involves who should bear the cost of the Italian government's recall of a prescription drug: the insured or the insurer. The plaintiffs are various underwriters subscribing to certain insurance policies and certificates (the Underwriters). They sued Abbott Laboratories (Abbott) to rescind policies that they had issued to Abbott. Abbott counterclaimed, seeking (1) a declaratory judgment regarding coverage, (2) damages for an alleged breach of contract, and (3) damages for vexatious delay in paying on the policies. An array of professionals from all over the world testified at two extensive bench trials. At the first trial to determine liability, the trial court rejected the Underwriters' rescission claim and Abbott's vexatious delay claim. At the second bench trial as to damages, the trial court found in favor of Abbott on its breach of contract claim, entered judgment against the Underwriters, and awarded Abbott $84.5 million (the limits of the insurance policies at issue here) and certain recoverable costs. The trial court rejected Abbott's request for prejudgment interest, but granted the request for postjudgment interest, awarding Abbott an additional $739,375. On appeal, the Underwriters contend that the trial court's rejection of their rescission claim and its finding that the Underwriters ratified coverage and waived rescission were against the manifest weight of the evidence. The Underwriters raise an additional claim regarding the trial court's denial of their motion to compel production of certain privileged documents prepared by a witness whom Abbott had withdrawn as an expert witness and presented only as a fact witness. On cross-appeal, Abbott contends that the trial court abused its discretion both in rejecting Abbott's counterclaim for vexatious delay damages and Abbott's request for prejudgment interest. We affirm.

BACKGROUND

¶ 3     Various underwriters at Lloyd's, London (Lloyd's) issued product recall insurance policies to Abbott for a three-year term beginning on April 13, 2000. The Underwriters seek to rescind those policies on the basis that Abbott made material misrepresentations in its insurance application regarding potential risks created when it acquired Knoll Pharmaceutical Company (Knoll).

¶ 4                                 The Lloyd's Policies

¶ 5     The policies issued to Abbott were structured into three layers. The second-layer policy provided that it would pay Abbott the amounts due resulting from losses covered by the first-layer policy, but only after the first-layer policy had paid or had been held liable to pay the full amount of the first-layer limits (and after application of the $20 million deductible). The third-layer policies, in turn, promised to pay the amounts for which Abbott was liable, but only in excess of the first- and second-layer policies and the deductible. The second- and third-layer policies stated that they were subject to the same terms and conditions as the first-layer policy, and both required that the first-layer policy remain in force.[1]

¶ 6     The first-layer policy provided that it would pay Abbott for losses incurred resulting from "Product Tampering or Accidental Contamination" of "Covered Products" during the policy period. The policy also provided coverage for government drug recalls under the rather counterintuitive rubric of "accidental contamination," which was defined in relevant part as "any formal or informal ruling of any regularly constituted national *** regulatory *** body during the Policy Period requiring recall or suspending sales of the Covered Product(s)," "Provided that the consumption or use of the Covered Product(s) *** has resulted *** in bodily injury, sickness, disease or death to any person or animal if consumed or used ***." "Accidental contamination" also included any consequent adverse publicity.

¶ 7     The policy further stated that if Abbott merged with or acquired another entity whose revenues were more than 5% of Abbott's, the new entity would automatically be covered by the policies, but Abbott had to provide written notice to the Underwriters within 90 days of the merger or acquisition and pay an additional premium to cover the additional risk. Computation of the premium was left open and was thus subject to negotiation on an *ad hoc* basis.

¶ 8     Under the section "Covered Losses," the policy provided coverage for product tampering or accidental contamination losses during the policy term "provided that as of the inception of this insurance, [Abbott's] Director of Risk Management was not aware and could not reasonably have been aware of circumstances which could produce" a covered loss. In addition, the entire policy would be "void" if Abbott "intentionally concealed or misrepresented any material fact or circumstance concerning this insurance" or made "any attempt to defraud [Underwriters] either before or after a Loss." If the policy was in effect for 60 days, Underwriters could cancel the policy for, in addition to other reasons: (a) Abbott's obtaining the insurance through "material misrepresentation"; (b) Abbott's violation of any of the terms and conditions of the insurance agreement; and (c) "the risk originally accepted has measurably increased." If the Underwriters cancelled the policy, however, they agreed to

---

[1] The third-layer policies required the maintenance of the second-layer policy, as well.

refund the unearned portion of any premium paid. Abbott initially paid an advance premium of $2.17 million for the three-year policy.

¶ 9     On December 15, 2000, Abbott announced that it agreed to acquire the global operations of Knoll whose products included Synthroid and Meridia. Knoll's revenues exceeded 5% of Abbott's revenues, so Abbott notified the Underwriters of the acquisition in February 2001, and provided written notice when the acquisition closed around March 2, 2001.

¶ 10     As noted above, an additional premium covering the Knoll business had to be determined. On February 22, 2001, Ian Harrison, an underwriter with the Beazley syndicate,[2] received Abbott's notice and initially proposed a premium that would have been two times the proportional increase in Abbott's sales following the Knoll acquisition. Abbott rejected that proposal.

¶ 11     Abbott submitted three applications to the Underwriters in connection with the Knoll acquisition; only the last of the three was signed. Question 25 of each application asked, *inter alia*, whether "the applicant, or its D&O's [directors and officers] have any knowledge of any current situation, fact or circumstance which might lead to a claim under an Accidental Contamination *** policy." Abbott answered "No" in each application. In the signature box at the end of the application was a statement that Abbott's signers declared "to the best of our knowledge" that the information provided was true and that no material information that might affect the Underwriters' judgment had been withheld.

¶ 12     On May 14, 2001, Harrison proposed a revised premium of $616,350, 25% of which would be refunded if no claims were made over the remaining three-year term. This proposal contained various conditions precedent, or "subjectivities," including a signed application and support from the entire "following market" of underwriters (*i.e.*, the underwriters who shared the risk with the lead underwriters under the same terms and conditions). Justin Whitehead, a broker with the Lloyd's-approved brokerage firm Heath Lambert, presented this information to Kelvin Mercer, the underwriter with American Specialty Underwriters syndicate (ASU).[3] Mercer then proposed a 50% return premium if no claims were made, to which Harrison agreed, subject to the conditions in the May 14, 2001 proposal. On May 22, 2001, Whitehead sent an e-mail to Walter Kerr, Abbott's insurance broker in the United States, noting the 50% premium refund, and adding that it was subject to "full market support" and submission of a signed and dated application, among other things. Abbott agreed and paid the premium to the Underwriters in early July 2001.

¶ 13     Greg Linder, Abbott's vice president and treasurer, signed the final application on May 29, 2001. Helmuth Fendel, an Abbott employee, e-mailed Kerr the next day, stating that Linder would be "signing the application today [*sic*]" and that Fendel would forward the application via "Fedex" to Kerr. Fendel further confirmed that the April 24, 2001, application disclosed "all known losses with a financial impact greater than $1,000,000," and added, "We are unaware of any other losses." Kerr forwarded this e-mail to Heath Lambert on May 31, 2001.

¶ 14     On June 1, 2001, Mark Colgate (a broker with Heath Lambert), began showing an endorsement form summarizing the new proposed terms to the various underwriters. At 7:58 p.m. (London time) on June 1, 2001, Colgate sent Kerr an e-mail informing him that: (1) Catlin

---

[2]The lead underwriter of the Abbott policies.

[3]The co-lead underwriter for the Abbott policies.

Underwriting Group syndicate had not agreed to the endorsement; (2) Mercer (the underwriter with the ASU syndicate) was away and therefore did not sign the endorsement; and (3) the other syndicates agreed to the endorsement but " 'subject to' your information regarding the losses and QA integration being signed by [Harrison] and [Mercer] \*\*\*–both have seen them but we do not have them formally agreed yet." Colgate's e-mail added as a further point, "This is all still subject to the application form being signed and dated–we need this asap [*sic*]."

¶ 15                                    The *Wall Street Journal* Article

¶ 16        On June 1, 2001, an article appeared in the *Wall Street Journal* entitled "FDA Could Make Abbott Pull Synthroid, Popular Thyroid Drug, From Market." The first paragraph of the article noted that the United States Food and Drug Administration (FDA) told the manufacturers of Synthroid that the medication had a " 'history of problems' " and could not be recognized as " 'safe and effective.' " The next paragraph added that the drug had been on the market for 40 years but had never officially been approved for use by the FDA, and it would be subject to regulatory action that could, "in the extreme, include removal from the market–a process that could begin as early as August." Finally, the article quoted an Abbott representative as saying: (1) it believed it only had to submit its application to the FDA by August 14; (2) it was "confident" the drug would be allowed to stay on the market; and (3) the FDA's two most recent inspections of its Synthroid plant found no violations in its manufacturing processes.

¶ 17        At about 2:23 p.m. Chicago time (8:23 p.m. London time) on the same day that the *Wall Street Journal* article appeared, Fendel sent an e-mail to Kerr advising him that Kerr and the Underwriters should be aware of the article. Fendel did not attach a copy of the article or describe its contents. At approximately 9:40 p.m. (London time), Kerr forwarded that e-mail to Whitehead and Ted James, an underwriter with PIA underwriting syndicate. The e-mail to Whitehead was automatically forwarded to Colgate at about the same time.

¶ 18                                    Abbott's Press Release

¶ 19        Also on June 1, 2001, Abbott issued a press release addressing the *Wall Street Journal* article. The press release stated that Synthroid was a safe and effective treatment for hypothyroidism and that Abbott intended to submit a "New Drug Application" (NDA) to ensure that the 8 million patients being treated with Synthroid had "continued access to their medication."

¶ 20                        The Underwriters' and Abbott's Subsequent Communications

¶ 21        The following Monday (June 4, 2001), Colgate (Abbott's London broker) replied to Kerr stating that he could not access the article. Kerr responded with a copy of the article attached. Colgate then asked Kerr to obtain written confirmation from Abbott whether the article was "correct," but Kerr responded that Abbott did not state that it was correct. Kerr later forwarded Abbott's press release to Colgate.

¶ 22        On June 5, 2001, Colgate e-mailed Kerr asking why Abbott did not include the information from the article in either its April 24, 2001, application or May 31, 2001, e-mail. Colgate also added that: he had not approached the "Catlin syndicate," it was unlikely that the group would agree to the endorsement, and that the XL Brockbank underwriting syndicate had not yet agreed to the endorsement. Colgate further expressed his intention to show the Underwriters

the "two [*sic*] news articles" the following day. Colgate stated that, if any Underwriters who had placed a subjectivity to their agreement tried to cancel their endorsement, Colgate would argue that they were "already on risk" and would await their reaction.

¶ 23 On June 6, 2011, Colgate gave Mercer (of the ASU syndicate) a copy of the *Wall Street Journal* article, and Colgate began distributing the final application, including the article, to the underwriters on the following day. Burkinshaw, an underwriter with Catlin, initialed the endorsement form, but added a subjectivity that the additional premium must be paid by July 1, 2001. Harrison stated that, on June 7, 2001, after learning of the *Wall Street Journal* article, his syndication group, Beazley, contacted attorney Michael Leahy to investigate Abbott's disclosures regarding Synthroid.

¶ 24 On June 8, 2001, Colgate spoke with Wright (the underwriter with XL Brockbank) about the Abbott application. Before reviewing the *Wall Street Journal* article, Wright had removed his prior subjectivity (requiring his speaking to Harrison) from the endorsement, but he reinstated it after reviewing the article. Other underwriters, including Harrison, Mercer, and Burkinshaw, initialed the endorsement and added the words "without prejudice." The phrase "without prejudice" meant either the underwriters were "not accepting the information," they were reserving their rights under the policy, or there was a subjectivity in place.

¶ 25 By July 1, 2001, the subjectivity placed by Wright–requiring a discussion with Harrison, the lead underwriter–still had not been resolved. Whitehead, the Heath Lambert broker, then asked Wright if Wright would allow the "Lloyd's Policy Signing Office" (LPSO) to distribute the *pro rata* portions of the additional premium to the other underwriters. Wright eventually agreed, and the LPSO distributed the premium payments to the other underwriters for the first- and second-layer policies on July 5, 2001. Those underwriters neither refused nor returned this additional premium. Leahy admitted that, by July 5, 2001, his clients had already formed a belief that Abbott had concealed material facts from them. The third-layer underwriters negotiated a revision to the endorsement to exclude any Synthroid-related claims (as to the third-layer policies only), and they later accepted their *pro rata* share of the additional premium in January 2002.

¶ 26 During August 2001, Leahy and Marc Rosenthal, Abbott's outside counsel, discussed a tolling agreement between the Underwriters and Abbott that would allow the parties to preserve their rights with respect to any Synthroid-related claims. Abbott agreed, and the Underwriters[4] and Abbott executed the tolling agreement in October 2001.

## The Meridia/Sibutramine Claim

¶ 28 On March 6, 2002, the Italian Ministry of Health announced the suspension of all sales and marketing of sibutramine in Italy. The parties stipulated that this action (and the resulting negative publicity) met the definition of "Accidental Contamination" under the policies. On March 21, 2002, Eugene Bader, Abbott's corporate risk management director, wrote to Robert Stellar of McLarens Toplis North America, Inc., informing Stellar of a potential loss related to Meridia (its sibutramine product) and asking Stellar to put Abbott's insurers on notice of the suspension. Abbott eventually submitted a claim under the policies for losses arising from the Meridia suspension.

---

[4]The tolling agreement did not include the third-layer underwriters as a party to the agreement.

¶ 29    On May 16, 2003, Holland wrote to Fendel, informing him that the Underwriters were cancelling the tolling agreement because Abbott had not fully responded to their document and information request. Fendel replied three days later, asking Holland to specify what information was still missing, but Holland did not respond. On June 2, 2003, plaintiffs filed a complaint for rescission against Abbott, which they amended on January 16, 2004. Abbott counterclaimed for a declaratory judgment as to coverage, for breach of contract, and for vexatious delay damages.

¶ 30                                    The Liability Trial

¶ 31    The case was bifurcated into liability (rescission) and damages phases. The bench trial on liability began on September 16, 2010.

¶ 32    Leahy testified that, before July 5, 2001 (when the Underwriters accepted the additional premium payment), he knew the "regulatory situation" surrounding Synthroid after reading the FDA materials, and he also knew that "some people within Abbott" also knew about the regulatory situation with respect to Synthroid prior to the date of the *Wall Street Journal* article. Leahy further confirmed that his clients had "formed a belief" prior to July 5, 2001, that Abbott had concealed material facts from them. Fendel and Linder, however, both testified that they were unaware of any situation that might lead to a claim under the policies.

¶ 33    The trial court found that the agreement with respect to the additional Knoll premium was subject to "at least" the following: (i) receipt of a satisfactory signed and dated application; (ii) full support of the "following market underwriters" for the proposed premium; (iii) receipt of the additional premium by July 1, 2001; and (iv) confirmation of no additional claims or notifications other than those in the unsigned application of April 24, 2001. The trial court further found that Abbott timely and sufficiently disclosed Synthroid's regulatory situation at the time when it provided the *Wall Street Journal* article with its signed May 29, 2001, application. In addition, the trial court observed that the Underwriters accepted the additional premium paid by Abbott, notwithstanding the testimony of Abbott's expert that the Underwriters could have refused the additional premium if they were unsatisfied with the terms and conditions listed on the endorsement. Accordingly, the court rejected the Underwriters' rescission claim on the dual grounds that Abbott did not intentionally make a material misrepresentation in its application and that the Underwriters ratified the Knoll endorsement, thus waiving any claim of rescission. The trial court, however, rejected Abbott's counterclaim for fees and costs grounded in the Underwriters' alleged vexatious and unreasonable conduct with respect to the Meridia claim, finding that a *bona fide* coverage dispute existed with respect to Synthroid which, if proved, would have voided the contract and excluded coverage for the Italian government-related Meridia claim.

¶ 34                                    The Damages Trial

¶ 35    The Underwriters and Abbott each presented expert witnesses regarding the calculation of damages. Both witnesses used regression models to calculate damages. Abbott's expert, Dr. Joel Hay, estimated Abbott's losses at $155.2 million, including about $5.4 million in related out-of-pocket expenses. The Underwriters' expert, Dr. Gregory Bell, also concluded that Abbott incurred $5.4 million in out-of-pocket expenses related to the removal of Meridia from

the Italian market. Dr. Bell's model, however, excluded longer-term data, which resulted in a loss in income of only $33.2 million.

¶ 36     The trial court issued a detailed written opinion, finding Dr. Hay more credible than Dr. Bell and that Abbott's lost profits were therefore $155.2 million. After applying the policies' deductible and 10% coinsurance, the trial court found the Underwriters were liable for $84.5 million, the aggregate limit under the policies. The written opinion stated that a judgment in favor of Abbott was "enter[ed] against Underwriters in the amount of $84,500,000."

¶ 37                The Awards of Prejudgment and Postjudgment Interest

¶ 38     On May 31, 2013, Abbott filed a motion to amend the judgment to include an award of prejudgment interest under the Illinois Interest Act (815 ILCS 205/2 (West 2012)). The trial court denied that motion in a written ruling. The court recounted that there was a four-day trial solely to determine damages, that the evidence included an "analysis of math and econometric concepts and calculations of global business losses," and that the Underwriters' and Abbott's experts provided different models to determine Abbott's losses. The court concluded that the damages were neither liquidated nor easily calculable, as would be necessary to impose prejudgment interest, and denied Abbott's request.

¶ 39     One week later, on June 24, 2013, the trial court entered a "final judgment," awarding Abbott $84.5 million (the limits of its coverage), approximately $2.8 million in recoverable costs, and postjudgment interest at the rate of 9% per year beginning on May 21, 2013, pursuant to section 2-1303 of the Code of Civil Procedure (735 ILCS 5/2-1303 (West 2012)).

¶ 40     This appeal and cross-appeal followed.

¶ 41                       ANALYSIS

¶ 42              The Underwriters' Claim for Rescission

¶ 43     The Underwriters first claim that the trial court erred in rejecting their claim for rescission. Among other things, they claim that because Abbott lied on the application regarding Synthroid risks, it cannot seek coverage for Meridia claims. The Underwriters argue that "Abbott's fraud in the application process" was "undeniably" shown in two circumstances: (i) when it answered "No" to question 25 in its applications that asked whether Abbott or its directors and officers had any knowledge of a fact or circumstance that might lead to a claim; and (ii) when Abbott and its brokers "deliberately" withheld the *Wall Street Journal* article from the Underwriters "until after they were bound to the Knoll risk."

¶ 44     Section 154 of the Illinois Insurance Code provides in relevant part as follows:

> "No misrepresentation *** made by the insured or in his behalf in the negotiation for a policy of insurance, or breach of a condition of such policy shall defeat or avoid the policy *** unless such misrepresentation *** shall have been stated *** in the written application therefor. No such misrepresentation or false warranty shall defeat or avoid the policy unless it shall have been made with actual intent to deceive or materially affects either the acceptance of the risk or the hazard assumed by the company." 215 ILCS 5/154 (West 2010).

¶ 45     This law thus establishes two situations where insurance policies may be voided: where the statement (1) is false and made with an intent to deceive, or (2) materially affects the acceptance of the risk or hazard assumed by the insurer. *Golden Rule Insurance Co. v.*

*Schwartz*, 203 Ill. 2d 456, 464 (2003). As a result, under the statute, even an innocent misrepresentation can serve as the basis to void a policy. *Id.*

¶ 46 The parties agree that, where, as here, the insurance application includes "knowledge and belief" language, it establishes a lesser standard of accuracy than that imposed under section 154, and thus shifts the focus in a determination of the truth or falsity of an applicant's statement from an inquiry into whether the facts asserted were true, to the applicant's actual knowledge and belief. *Id.* at 466. This standard, however, does not completely foreclose review of the applicant's responses. Instead, the phrase "knowledge and belief" requires that " 'knowledge not defy belief.' " *Id.* at 467 (quoting *Skinner v. Aetna Life & Casualty*, 804 F.2d 148, 151 (D.C. Cir. 1986)).

¶ 47 "In order for a plaintiff to prevail on a claim of fraudulent misrepresentation, he or she must establish the following elements: (1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the plaintiff to act; (4) action by the plaintiff in justifiable reliance on the truth of the statement; and (5) damage to the plaintiff resulting from such reliance." *Doe v. Dilling*, 228 Ill. 2d 324, 342-43 (2008). The trial court, as finder of fact, is in the best position to evaluate the conduct and demeanor of the witnesses; as such, we must give great deference to its credibility determinations, and we may not substitute our judgment for that of the trial court. *Samour, Inc. v. Board of Election Commissioners*, 224 Ill. 2d 530, 548 (2007). In addition, the resolution of inconsistencies and conflicts in testimony are for the trier of fact. *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 179 (2006).

¶ 48 Therefore, we defer to the trial court's factual findings unless they are contrary to the manifest weight of the evidence. *Nokomis Quarry Co. v. Dietl*, 333 Ill. App. 3d 480, 484 (2002). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented. *Best v. Best*, 223 Ill. 2d 342, 350 (2006). In other words, if there is any evidence in the record to support the trial court's findings, we may not disturb its findings and judgment. *Nokomis Quarry Co.*, 333 Ill. App. 3d at 484.

¶ 49 In this case, there was ample evidence to support the trial court's findings. The evidence showed that Abbott's insurance policies *automatically* covered the Knoll purchase–the only matter remaining to be determined was the amount of the additional premium. Once a premium had been established by the lead underwriter, an endorsement summarizing the revised terms was circulated among the other participating underwriting syndicates. As the endorsement circulated, various underwriters initialed their agreement but with certain subjectivities, or conditions precedent. Among them were the receipt of a complete and signed application, full support of the "following market," and payment of the additional premium by July 1. Abbott presented two unsigned applications regarding the information with respect to Knoll; with its signed and complete application, it included information regarding the *Wall Street Journal* article that had appeared that day. At the time of the receipt of the application and article, there was neither full following market support, nor had the premium been paid (as July 1 had not yet arrived).

¶ 50 Moreover, the trial court below properly found that Abbott had disclosed the article in a timely manner. On the same day the article appeared, Abbott (through Fendel) notified its agent in the United States, Kerr, who then forwarded that information immediately to the Lloyd's-approved broker in London (Heath Lambert). On these facts, we cannot say that the

trial court's finding that Abbott did not intend to materially misrepresent the Synthroid regulatory status was unreasonable, arbitrary, or not based on the evidence presented, or that the opposite conclusion is clearly evident; as such, the trial court's holding was not against the manifest weight of the evidence. *Best*, 223 Ill. 2d at 350. Since there is "any evidence" in the record to support the trial court's findings, we may not disturb its findings and judgment. *Nokomis Quarry Co.*, 333 Ill. App. 3d at 484.

¶ 51                    Whether the Underwriters Ratified Coverage and Waived Rescission

¶ 52        The Underwriters also contend that the trial court erred in finding that they ratified the terms of the policies after the Knoll acquisition (and thus waived claims of rescission) when they accepted the premiums. The Underwriters argue that they immediately voiced their concerns with respect to the Synthroid regulatory status and began an investigation, but their investigation was delayed due to Abbott's refusal to tender the Knoll due diligence documentation. The Underwriters further claim that they entered into a tolling agreement to preserve their rights.

¶ 53        An insurer seeking to rescind an insurance contract based upon fraud or misrepresentation must choose to do so promptly after learning of the alleged fraud or misrepresentation. *Lumbermen's Mutual Casualty Co. v. Sykes*, 384 Ill. App. 3d 207, 223 (2008). By not taking such necessary steps to set aside a claimed fraudulent agreement in a timely manner, a party may be found to have ratified it and be barred from later attempting to rescind it. *Id.* It is well established that waiver may be found where an insurer continues under an insurance policy " 'when it knows, or in the exercise of ordinary diligence, could have known the facts in question giving rise to the defense.' " *American States Insurance Co. v. National Cycle, Inc.*, 260 Ill. App. 3d 299, 306 (1994) (quoting *Kenilworth Insurance Co. v. McDougal*, 20 Ill. App. 3d 615, 620 (1974)). Strong proof is not required to establish a waiver of a policy defense, but only such facts as would make it unjust, inequitable or unconscionable to allow the defense to be asserted. *State Farm Mutual Automobile Insurance Co. v. Gray*, 211 Ill. App. 3d 617, 621 (1991). The parties agree that the trial court's findings with respect to ratification and waiver may not be disturbed unless it was against the manifest weight of the evidence. See *Swader v. Golden Rule Insurance Co.*, 203 Ill. App. 3d 697, 702 (1990).

¶ 54        Here, the Underwriters, when faced with what they believed was Abbott's intentional misrepresentation with respect to the Knoll acquisition, did not reject the terms of the endorsement. They initially sought the due diligence materials with respect to the Knoll acquisition, but when Abbott responded with a request that the Underwriters provide a more focused and concise request, they did not respond to that request nor to Abbott's invitation to meet in person to discuss the issues regarding the Knoll acquisition. Instead, they went ahead and issued the insurance by accepting the premium. It is only when the magnitude of the Meridia claim became apparent that the Underwriters then renewed their year-old request for the Knoll due diligence documentation. In the exercise of ordinary diligence, the Underwriters could have ascertained the pertinent facts regarding what Abbott knew about Synthroid's regulatory status, but instead, they did nothing. Waiver has been found under such circumstances. See *American States Insurance Co.*, 260 Ill. App. 3d at 306. On this issue, as well, we cannot say that the trial court's finding is unreasonable, arbitrary, or not based on the evidence, or that the opposite conclusion is clearly evident; consequently, its finding was not against the manifest weight of the evidence. *Best*, 223 Ill. 2d at 350.

¶ 55    The Underwriters claim, however, that it was only when Abbott tendered its Knoll due diligence, including Exhibit 13.19, that they became aware that Abbott had known of the Synthroid regulatory situation prior to June 1, 2001. Dr. Stewart Ehrreich, the Underwriters' expert witness as to FDA regulatory matters, however, admitted that all relevant facts pertaining to the Synthroid regulatory situation were contained in the *Wall Street Journal* article as well as the publicly available information referenced in that article. In addition, the Underwriters' attorney, Leahy, admitted at trial that he and the Underwriters knew *prior to* accepting the premium on July 5 that Abbott was aware of the Knoll regulatory issues. We further note that the Underwriters delayed requesting the due diligence documentation for Knoll for more than a year, until shortly after the time that the Meridia claim arose. Finally, Exhibit 13.19 is not the "smoking gun" the Underwriters portray it to be: It contains no additional information not already set forth in the *Wall Street Journal* article. The Underwriters' argument on this point is therefore meritless.

¶ 56                    The Underwriters' Motion to Compel Production of Privileged Documents

¶ 57    The Underwriters next contend that the trial court erred in denying their motion to compel the production of certain privileged documents to aid in their cross-examination of Michael Skweres, a potential expert witness.

¶ 58    Even assuming, *arguendo*, that the trial court erred in denying the motion to compel, the Underwriters suffered no prejudice. Skweres's testimony only concerned the preparation of a proof of loss for Abbott's Meridia claim, which was rendered superfluous when the Underwriters decided to deny coverage and seek rescission based upon an alleged fraudulent misrepresentation. "[W]here an insurer's denial of liability for a loss claimed by an insured is based upon grounds other than the insured's failure to file a proof of loss, the insurer has waived or rendered unnecessary compliance with the proof of loss requirement in the policy." *Gray*, 211 Ill. App. 3d at 621. Skweres's testimony was solely factual in nature. To the extent that the Underwriters claim that Skweres rendered expert testimony, their claim is without merit for two reasons. First, the Underwriters admitted at trial that Skweres did not render expert testimony during his direct examination, so they cannot now complain that he did. See *Meyers v. Woods*, 374 Ill. App. 3d 440, 448 (2007) (holding that, where the defendant agreed at trial with the trial court's statement that the claims were based on contract and not negligence, the defendant waived the contention that it was error for the trial court to do so). Second, they forfeited this issue for failure to raise it following their cross-examination. See *Wheeler-Dealer, Ltd. v. Christ*, 379 Ill. App. 3d 864, 870 (2008) (holding that the failure to renew an objection when allegedly improper evidence is offered at trial results in a waiver of any challenge to the trial court's consideration of that evidence). We therefore reject the Underwriters' claim of error.

¶ 59                                    Postjudgment Interest

¶ 60    Finally, the Underwriters appeal from the trial court's award of $739,375 in postjudgment interest in favor of Abbott. This amount represents about a month's worth of interest on the judgment. The month in question ran from May 20, 2012 (the date of the damages award) to June 18, 2012 (the date the court ruled on Abbott's motion to amend the damages award to

include prejudgment interest). The Underwriters contend that the trial court should not have awarded postjudgment interest earlier than June 18, 2012, because Abbott's request for prejudgment interest was still an outstanding claim that made the May judgment nonfinal and not subject to the accrual of interest.

¶ 61     Section 2-1303 of the Code of Civil Procedure (Code) provides in relevant part:

> "Judgments recovered in any court shall draw interest at the rate of 9% per annum from the date of the judgment until satisfied ***. When judgment is entered upon any award, *** interest shall be computed at the above rate, from the time when made or rendered to the time of entering judgment upon the same, and included in the judgment." 735 ILCS 5/2-1303 (West 2012).

¶ 62     The trial court has no discretion to deny postjudgment interest, as the imposition of statutory interest from the date the final judgment was entered is mandatory. *Longo v. Globe Auto Recycling, Inc.*, 318 Ill. App. 3d 1028, 1039 (2001). The Underwriters further agree that section 2-1303 mandates the accrual of interest "notwithstanding the prosecution of an appeal, or other steps to reverse, vacate or modify the judgment." 735 ILCS 5/2-1303 (West 2012).

¶ 63     *Andrews v. Kowa Printing Corp.*, 351 Ill. App. 3d 668 (2004), provides guidance on this issue. In *Andrews*, the plaintiffs moved for an award of attorney fees and prejudgment interest on April 30, 2003. *Id.* at 672. On September 29, 2003, the trial court entered the final judgment, which incorporated its findings from its earlier April 21, 2003, decision (that found in favor of the plaintiffs) and added prejudgment interest from April 21, 2003, to September 29, 2003. *Id.* On appeal, the *Andrews* court affirmed the trial court's decision, stating, "The trial court's decision, reflected in an 11-page written opinion dated April 21, 2003, was an 'award, report, or verdict' within the meaning of [section 2-1303 of] the Code; thus, the trial court was correct in awarding interest from April 21, 2003." *Id.* at 683.

¶ 64     With respect to this issue, the facts of this case are virtually indistinguishable from *Andrews*. Here, the last page of the trial court's written opinion dated May 20, 2013, awarded Abbott its policy limits of $84.5 million, is entitled "Judgment," and is also an award, report, or verdict under section 2-1303. Although the Underwriters assert in reply that *Andrews* is distinguishable because "the interest claimed and awarded was after a written judgment had been entered but before the final 'wrap up' judgment," we fail to see that distinction–the trial court's order awarding Abbott its postjudgment interest was also entered after the initial award. In any event, *Andrews* does not include any such factual limitation within its holding.

¶ 65                               Abbott's Cross-Appeal

¶ 66     Abbott cross-appeals both the trial court's rejection of its counterclaim for vexatious delay and the denial of its request for prejudgment interest. With respect to the vexatious delay claim, Abbott argues that the trial court erred in denying its counterclaim for damages composed of attorney fees and costs, arising from the Underwriters' purported "vexatious and unreasonable" handling of the Meridia claim. Abbott claims that the trial court "did not give due weight to its own many factual findings" in rejecting Abbott's counterclaim because the Underwriters had all of the information regarding the Synthroid regulatory situation by early July 2001 but kept the additional premium payment and allegedly "resurrect[ed]" this matter upon learning of the magnitude of the Meridia claim.

¶ 67     Section 155(1) of the Illinois Insurance Act provides in part as follows:

"In any action by or against a company wherein there is in issue the liability of a company on *** policies of insurance ***, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, [and] other costs ***." 215 ILCS 5/155(1) (West 2010).

¶ 68    The determination of whether an insurer's conduct violates section 155 requires a trial court to consider the totality of the circumstances. *Golden Rule Insurance Co.*, 203 Ill. 2d at 469. Delay in settling a claim may not violate the statute if there is a *bona fide* dispute over coverage. *Id.* The award of fees under section 155 of the Illinois Insurance Code is a matter within the sound discretion of the trial court, and we will not disturb the trial court's decision absent an abuse of discretion. *Buckner v. Causey*, 311 Ill. App. 3d 139, 150 (1999). A court abuses its discretion only where its ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would adopt the court's view. *TruServ Corp. v. Ernst & Young LLP*, 376 Ill. App. 3d 218, 227 (2007).

¶ 69    Here, the trial court's denial was not an abuse of discretion. Although the Underwriters lost their claim for rescission before the trial court, which we have now upheld on appeal, we nevertheless hold that this case presented a *bona fide* dispute. We recognize that the Underwriters' claim centered on the application disclosures related to Synthroid, not Meridia. Had the Underwriters' claim prevailed, however, they would have been granted rescission and would not have been required to pay the Meridia claim. See *Weinstein v. Metropolitan Life Insurance Co.*, 389 Ill. 571, 578-79 (1945) ("That an ailment or malady, knowledge of which an applicant withheld from an insurer, was not actually the cause of death is not decisive against a finding of materiality. Materiality to risk may exist notwithstanding proof of fatality owing to another cause."). Based upon our review of the record, as well as the trial court's detailed opinion, we cannot say that its decision was arbitrary, fanciful, or unreasonable, or that no reasonable person would adopt the court's view. *TruServ Corp.*, 376 Ill. App. 3d at 227. As such, the trial court's decision to deny additional damages was not an abuse of discretion.

¶ 70    Abbott next contends that it is entitled to prejudgment interest because the amount of damages was easily calculable in the sense that the claimed amount of its loss always exceeded the policy limits. Therefore, according to Abbott, it is entitled to prejudgment interest on the $84,500,000 policy limit. The Underwriters respond that the amount at issue was far from readily determined, and thus the trial court properly denied the request for prejudgment interest.

¶ 71    Section 2 of the Interest Act (815 ILCS 205/2 (West 2010)) states in relevant part that creditors shall receive an additional 5% per year for all moneys due on any "instrument of writing." An insurance policy is a written instrument covered by this statute. *Marcheschi v. Illinois Farmers Insurance Co.*, 298 Ill. App. 3d 306, 314 (1998). "In order to recover prejudgment interest, the amount due must be liquidated or subject to an easy determination." *Santa's Best Craft, L.L.C. v. Zurich American Insurance Co.*, 408 Ill. App. 3d 173, 191 (2010). "[I]f judgment, discretion, or opinion, as distinguished from calculation or computation is required to determine the amount of the claim, it is unliquidated." (Internal quotation marks omitted.) *Dallis v. Don Cunningham & Associates*, 11 F.3d 713, 719 (7th Cir. 1993). The award of prejudgment interest under section 2 of the Interest Act is reviewed for an abuse of discretion. *Marcheschi*, 298 Ill. App. 3d at 313. As noted above, we will find an abuse of

discretion only where the trial court's ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would adopt the court's view. *TruServ Corp.*, 376 Ill. App. 3d at 227.

¶ 72 The trial court did not abuse its discretion on this issue. Evidence was heard over four days solely on the issue of damages. Testimony included expert witnesses who presented individual regression analyses supported by various econometric models to determine the amount of future lost income that Abbott suffered from the recall of Meridia in Italy, as well as the decrease in worldwide income from Meridia resulting from the ensuing negative publicity. The Underwriters' and Abbott's experts reached wildly differing conclusions: Abbott's expert estimated losses at over $150 million (well in excess of the policy limits), but the Underwriters' expert estimated losses at "only" $33 million (well within the policy limits). Although the trial court ultimately sided with Abbott's expert, Abbott points to nothing in the record–and we see nothing in the 119-volume record–establishing that the Underwriters' expert's much lower damages estimate was patently unreasonable.

¶ 73 CONCLUSION

¶ 74 For these reasons, the trial court's finding against the Underwriters as to their rescission claim was not against the manifest weight of the evidence, nor was its finding that the Underwriters ratified coverage and waived rescission. In addition, the trial court's denial of the Underwriters' motion to compel the production of certain privileged documents was not erroneous, and in any event, any purported error was not prejudicial to the Underwriters. We further hold that the trial court did not err in setting the date from which postjudgment interest to Abbott would accrue. Finally, neither the trial court's rejection of Abbott's counterclaim for vexatious delay nor its rejection of Abbott's request for prejudgment interest was an abuse of discretion. Accordingly, we affirm the judgments of the trial court.

¶ 75 Affirmed.